UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KENNETH M. KANSKY,                  )
      Plaintiff,              )
                                )
                                )    CIVIL ACTION NO.
      v.                      )    05-10908-DPW
                                )
                                )
COCA-COLA BOTTLING COMPANY OF       )
NEW ENGLAND, COCA-COLA ENTERPRISES,)
INC., COCA-COLA ENTERPRISES LONG    )
TERM DISABILITY PLAN A/K/A CORE     )
LTD BENEFITS, and AETNA LIFE        )
INSURANCE COMPANY,                  )
      Defendants.             )

MEMORANDUM AND ORDER
May 1, 2006

Plaintiff Kenneth M. Kansky brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 against Aetna Life Insurance Company ("Aetna"), Coco-Cola Enterprises, Inc., and Coco-Cola Enterprises Long Term Disability Plan seeking review of Aetna's decision to deny him long-term disability ("LTD") benefits.  The dispute centers on whether Aetna properly determined that Kansky's disabling condition in July 2003 was caused or contributed to by his pre-existing schizoaffective disorder.  Kansky contends that the condition was caused solely by the development of chronic fatigue syndrome ("CFS"), for which he had never been treated.  Kansky also seeks sanctions against the defendants for allegedly failing to produce requested documents pursuant to 29 U.S.C. §

-1-

1132(a),(c).  Both the plaintiff and the defendants have moved

for summary judgment on the Administrative Record ("AR").

Kansky, however, seeks to have the Court consider additional

evidence, which the defendants have moved to strike.

### A. BACKGROUND

The facts are largely undisputed except for the cause of

Kansky's disabling condition in July 2003.[1]

Kansky was born on August 25, 1971 and graduated from

Hofstra University in 1993. (AR000540).  He was hired by Coca-

Cola Enterprises as a warehouse supervisor on April 21, 2003,

following several other jobs in the beverage industry.

(AR000539-AR000540).  He worked at the Coca-Cola Bottling Company

of New England division in Needham Heights, Massachusetts until

July 7, 2003 when he claims to have become disabled. (AR000271,

AR000539-AR000540).  Thereafter, Kansky collected short-term

disability ("STD") benefits until December 2003.  (AR000538).

Following the exhaustion of his STD benefits, he applied for LTD

benefits under Coca-Cola Enterprises LTD Plan ("the Plan") on

January 8, 2004.  (AR000540-AR000541).  Kansky indicated in the

application that the reason why he stopped working was a

---

[1] Kansky does not contest any of the facts set out in
Defendants' Local Rule 56.1 Statement Material Facts as to Which
There is No Genuine Issue to be Tried.  "Opposition to motions
for summary judgment shall include a concise statement of the
material facts of record as to which it is contended that there
exists a genuine issue to be tried, with page references to
affidavits, depositions and other documentation."  L.R. 56.1.

"chemical imbalance of physiological origin."  (AR000540).

To be eligible for monthly LTD benefits, Kansky is required by the Plan to satisfy each of the following conditions:

- A physician has determined you to be "totally disabled" due to a physical or mental condition....

- You have provided proof to Aetna that you became totally disabled while insured under this Plan and that you have been totally disabled for 26 weeks. This 26-week period is called the "benefit qualifying period."

(AR000194).  In addition, certain conditions are excluded from coverage.  (AR000195).  Relevant here is the express reservation that benefits will not be paid under the Plan if the disability:

Starts during the first 12 months of your most recent period of coverage under this Plan **and** is caused, or contributed to, by a "pre-existing condition."  An injury or illness is a pre-existing condition if, during the 3 months before the date you became covered under this Plan, you received diagnosis, treatment or services, or you took drugs prescribed or recommended by a physician, for that condition.

(AR000195 (emphasis in original); <u>see</u> <u>also</u> AR000103, AR000179-AR000180).

Prior to his employment with Coca-Cola Enterprises, Kansky had been diagnosed with schizoaffective disorder, sometimes referred to as atypical schizophrenia or schizoaffective disorder, bipolar type in his medical records.  (AR000247, AR000282-AR000283, AR000486, AR000502, AR000812, AR000819, AR000831).  His out-patient treating psychiatrist, Dr. Alexander Vuckovic, initially diagnosed and treated him as an adolescent

until 1994.  (AR000502, AR000966).  Dr. Vuckovic began treating Kansky again in February 2000, after he suffered an episode that required hospitalization at McLean Hospital.  (AR000247, AR000337, AR000502).  Kansky's schizoaffective disorder diagnosis has been constant since his hospitalization in 2000.  (AR000247, AR000282-AR000283, AR000502, AR000807, AR000812, AR000819, AR000831).  He was also treated as an in-patient again at McLean Hospital from December 28, 2003 through January 7, 2004. (AR000247-AR000250).

During the three months period before Kansky became covered by the Plan -- April 1, 2003 through June 30, 2003 -- Dr. Vuckovic treated and prescribed medications to Kansky related to his schizoaffective disorder diagnosis.  (AR000905-AR000908, AR000936-AR000939).

Aetna first denied Kansky's claim in a letter dated April 26, 2004 signed by DawnLee Dumond.  (AR000482-AR000485).  The letter explained that based on Aetna's review of the information provided to date, Kansky's disability arose from a pre-existing condition. (AR000483).  Since Kansky's last day of work was in the first twelve months of coverage and since he was treated by Dr. Vuckovic and prescribed medications during the pre-existing limitation period of April 1, 2003 through June 30, 2003, Aetna determined that he was not eligible for LTD benefits. (AR000483).  Kansky appealed this determination in a letter dated June 18, 2004 arguing that Aetna improperly denied him LTD

-4-

benefits "on the incorrect presumption and assumption that he was and is suffering from a pre-existing condition." (AR000236). Kansky's attorney explained that "[t]he basis of the appeal as the evidence will show is that Mr. Kansky is now totally disabled by this subsequent condition [namely, Myalgic Encephalomyelitis or CFS], contrary to the findings made to support the previous incorrect decision of April 26, 2004." (AR000236, AR000997-AR000998). In a prior letter responding to the April 26, 2004 denial, Kansky's attorney set out his criticisms of the denial in more detail. (AR000464-469). After receiving the June 18, 2004 letter, Aetna forwarded Kansky's file to its appeals division. (AR000697).

In a letter dated July 30, 2004 and signed by Clare Cody, an Aetna Senior Technical Specialist, Aetna upheld the denial of Kansky's LTD benefits claim due to the pre-existing condition exclusion. (AR000237-AR000239). This time, however, Aetna elaborated on its reasoning and cited to evidence supporting its determination. Specifically, Aetna referenced Dr. Vuckovic's January 12, 2004 and February 10, 2004 Attending Physician Statements, (AR000807, AR000810, AR000819-AR000820); the discharge summary from McLean Hospital dated January 7, 2004, (AR000247-AR000250); Kansky's answers to Aetna's Supplemental Information Questionnaire dated February 10, 2004, (R000815-AR000816); Walgreen's Pharmacy records, (AR000936-AR000939); Dr. Vuckovic's treatment records, (AR000257-AR000277); and the record

-5-

of the conversation between Dr. Vuckovic and Aetna's Psychiatric
Consultant (Dr. Walter DeFoy), (AR000502, AR000585-AR000586).
(AR000238).  See also April 13, 2004 report of Dr. Melvyn
Attfield, a consultant psychologist.  (AR000486-AR000490).  Based
on these records, Aetna concluded that "the condition for which
Mr. Kansky is seeking long term disability benefits,
schizoaffective disorder with symptoms of depression, was caused
or contributed to by conditions for which he received treatment
and took drugs during the pre-existing condition exclusionary
period, April 1, 2003 through June 30, 2003."  (AR000238).

    In response to this second denial, Kansky's attorney
complained in a letter dated August 3, 2004 that Ms. Cody
improperly "rush[ed] to judgment" by not waiting the full 180 day
period set forth in the April 26, 2004 notice of denial for
submission of "forthcoming evidence" supporting Kansky's
challenge to Aetna's determination "that his disability arises
from a pre-existing condition."[2]  (AR000234-AR000235, AR000483).

---

    [2] The April 26, 2004 denial letter, however, stated that:

    We will review any additional information you care to
    submit, to establish that this was not a pre-existing
    condition....  To obtain a review, you should submit a
    written request.... Your written request for review must
    be mailed or delivered to the address above within 180
    days following receipt of this notice, or a longer period
    if specified in [Kansky's] plan brochure or Summary Plan
    Description.  You will receive notification of the final
    determination within 45 days following receipt of your
    request. (AR000484).

In Kansky's June 18, 2004 notice of appeal, Kansky's attorney

Counsel followed up this letter with a fax on August 4, 2004 that
included documents purported to be "the long awaited proof based
upon scientific and medical evidence that Mr. Kenneth M. Kansky
is and has been totally disabled from working since July, 2003,
by reason of the diagnosis of Chronic Fatigue Immune Dysfunction
Syndrome, for which he had never before been treated and with
which he had never before been diagnosed at the time he began
work at Coca-Cola Bottling Company." (AR000278).  This evidence
consisted of a February 27, 2004 CFS Profile Test from the
University of Hawaii at Monoa based on measuring Ciguatara Toxin
levels and a July 26, 2004 letter to Kansky's primary care
physician, Dr. Kim Bauman, from Dr. David S. Bell, a primary care
pediatrics and family practice doctor (who, according to his
curriculum vitae, has given lectures on CFS and has served as the
Chairman of the Chronic Fatigue Syndrome Advisory Committee for
the United States Department of Health and Human Services),
reporting his conclusion that "[t]he pattern of [Kansky's]
symptoms is very suggestive of chronic fatigue syndrome."
(AR000284, AR000278-AR000296).  Dr. Bell reported that Kansky
"has had fairly severe weakness and exhaustion which have been
progressive since June of 2003."  According to Dr. Bell it is the
persistent symptom of fatigue, "which has been present on a

_____

indicated that "the documents to fully support his physical
disability is being assembled and will be available and provided
in or within the 180 day period as set forth and permitted in
Aetna's April 26, 2004, Notice of Denial."  (AR000998).

-7-

continuous basis for over the past year" that "clearly limits his activities and ... does not respond to appropriate rest." (AR000282-AR000283). Dr. Bell acknowledged that "[a]t the present time Mr. Kansky would not fulfill the Centers for Disease Control criteria for chronic fatigue syndrome as he has a history of atypical schizophrenia." (AR000284). Nonetheless, he concluded that while "[i]t has been suggested that perhaps his exhaustion is related to his medication, ... he did not have these symptoms during the early times of his medication usage.... [Consequently,] [a]t the present time [he] would feel that chronic fatigue syndrome is a more accurate clinical diagnosis than his atypical schizophrenia, as he has been well managed from a psycho-social and emotional point of view. His medications appear to be helping hi[m] quite significantly. Nonetheless, the symptoms of exhaustion and pain have made it so that he has not been able to be at work at the present time." (AR000284).

Aetna treated the August 3, 2004 letter as a second appeal of the denial of Kansky's LTD claim and indicated it would consider the new information regarding Kansky's claim. (AR000230, AR000441). After receiving the August 4, 2004 documents, Aetna "had the entire file and the information received on appeal reviewed both by a Physician Consultant and a Psychiatric Consultant." (AR000231). The Physician Consultant, Dr. Brent T. Burton, an occupational medicine doctor licensed in Oregon, reviewed all of the medical records and entered a report in

Aetna's Notepad on October 8, 2004.  (AR000643-AR000651,

AR000634-AR000642, AR000633).  He concluded:

> The Medical data contained in this file indicate that Mr.
> Kansky is a 33-year-old warehouse supervisor who has not
> worked since 7 July 2003.  The hospital discharge summary
> indicates that Mr. Kansky has been diagnosed with
> schizophrenia since 2000.  As a result of this disorder,
> he has experienced episodic mental status dysfunction
> characterized by hallucinations, delusions, and abnormal
> behavior.  Mr. Kansky has maintained follow-up with Dr.
> Vuckovic, who apparently has developed a treatment plan
> to control his schizophrenia.  However, the data
> presented by Dr. Vuckovic do not provide any verification
> of Mr. Kansky's underlying diagnosis, associated
> impairment, or a rationale to justify removal from
> workplace activities.

> This file contains numerous letters issued by Mr.
> Kansky's father, a practicing attorney, who is obviously
> advocating on behalf of his son to obtain disability
> benefits.  It appears that Mr. Kansky's father is
> proposing that Mr. Kansky has a condition referred to as
> "CFIDS" (chronic fatigue immune deficiency syndrome).
> However, this condition has not been documented within
> the medical records, for several reasons.  Most
> importantly, the so-called CFIDS is not a legitimate
> medical diagnosis.  There are no diagnostic criteria that
> have been accepted as a basis to establish this purported
> diagnosis.  Moreover, the report issued by Dr. Bell does
> not confirm this "diagnosis."  Dr. Bell admits that Mr.
> Kansky does not qualify for the CDC designation of
> "chronic fatigue syndrome," which he notes has been
> developed only for the purpose of conducting research and
> does not qualify for a clinical diagnosis.

> In summary, Mr. Kansky has been diagnosed with
> schizophrenia, which may potentially be a legitimate
> source of impairment that would, at least periodically,
> render him unable to work should his condition relapse or
> become medically uncontrolled.  This mental/nervous
> condition is also the likely source of his stated
> complaints of fatigue, etc.  There is no medical support
> for the alleged diagnosis of CFIDS, chronic fatigue, or
> any other medical diagnosis as a source of physical
> impairment.  Mr. Kansky's subjective complaints of
> fatigue and sleep disorder do not constitute impairments
> that would render him unable to resume work.

(AR000638-AR000641).

The Psychiatric Consultant, Dr. Walter DeFoy, a board certified psychiatrist licensed in Texas, also reviewed all of the medical records and entered a report in Aetna's Notepad on November 9, 2004.  Dr. DeFoy commented that typed copies of Dr. Vuckovic's illegible notes and the complete medical records from McLean Hospital would be necessary for a full review, (AR000593-AR000594).  On the subject of the cause of Kansky's purported disability, Dr. DeFoy explained that:

> [T]he clinical criteria for schizoaffective disorder, bipolar type includes the criteria for Major Depressive Episode as listed in DSM IV.  These criteria include sleep disturbance (insomnia or hypersomnia in atypical depressive features), weight gain in atypical depressive features, and fatigue or loss of energy nearly everyday (experienced as a distinct loss of energy).  It is the presence of these criteria that preclude the diagnosis of chronic fatigue syndrome being made after a diagnosis of a psychiatric disorder that includes a depressive episode.  Therefore, I conclude from the available clinical evidence presented that the EE [employee] was destabilized from his maintained chronic psychiatric condition by changes in his work schedule and long work periods ... That as a result, the EE began to experience depressive mood swing with the attendant criteria described above and eventually developed a paranoid psychotic state characterized by paranoid delusions and auditory hallucinations as corroborated by the letter from the EE's mother who refers to reports from his sister indicating non-compliance with is medication.  In addition he also developed some signs and symptoms common to both chronic fatigue and major depressive disorder and may have both a condition characterized by chronic fatigue from his psychiatric disorder as well as another medical condition.  However, his psychiatrist, Dr. Vuckovic, is clear that the diagnosis of s[c]hizoaffective disorder, bipolar type has been present since 2000 and as such is the primary diagnosis impairing this EE and is continuing to be treated as [*sic*] this

condition as of last report.  Dr Bell offers no specific
treatment regimen in his letter to Dr Bauman except to
say that his medications were being handled "in a very
appropriate and excellent manner" and he recommended that
"they not be interfered with."  He recommended that the
dose of Nardil "might be changed" but that it was "up to
his psychopharmacologist to decide."   He recommended
sleep hygiene instruction.

(AR000594-AR000595, AR000585-AR000586).

Aetna denied Kansky's claim for LTD benefits for a third
time in a letter dated November 9, 2004 and signed by Ms. Cody.
After quoting some of the sections of the Physician Consultant
and Psychiatric Consultant reviews set out above, Ms. Cody
concluded that:

> Dr. Bell's examination of Mr. Kansky took place on July
> 20, 2004; over six months after Mr. Kansky's LTD benefits
> would have become payable.[3]   Even if Dr. Bell found
> conclusively that Mr. Kansky suffered from CFIDS or any
> other diagnosis (which was not the finding stated by Dr.
> Bell in his report), Mr. Kanksy's condition and
> functionality cannot not be predicated over six months
> earlier, long before Dr. Bell's examination.   The
> discharge summary of the Psychotic Disorders Unit of
> McLean Hospital where Mr. Kansky was hospitalized at the
> time LTD benefits would have become payable, supports
> that he was treated for schizophrenia, congenital renal
> abnormalities, hypertension and chronic mental illness.
> Since there was no medical evidence provided for our
> review that support that the diagnoses of congenital
> renal abnormalities or hypertension rose to the level of
> disabling illnesses; the remaining diagnosis of
> schizophrenia is found to be the disabling condition at

---

[3] According to the LTD Plan brochure, an employee is only
entitled to LTD benefits if he or she provides proof that he or
she has "became totally disabled while insured under this Plan
and that [he or she has] been totally disabled for 26 weeks. This
26-week period is called the 'benefit qualifying period.'"
(AR000194). "[B]enefits are payable after the qualifying period
ends for as long as the period of total disability continues."
(AR000170).

the time that LTD benefits would have become payable.

Based on the above medical reviews, and my own review of the claim, the clinical data available for evaluation does not support that Mr. Kansky had limitations and restrictions attributable to chronic fatigue syndrome that would preclude him from performing the material duties of his own occupation as of January 6, 2004. Further, we find that the primary condition from which Mr. Kansky was suffering at that time was schizoaffective disorder with symptoms of depression....

Since the records we have reviewed support that Mr. Kansky received treatment and took drugs for schizo-affective disorder during the pre-existing condition exclusionary period, April 1, 2003 through June 30, 2003, and that his other conditions have not been established to result in a level of impairment that he would have been precluded from performing the material duties of his own occupation as of January 6, 2004, the denial of his LTD benefits due to the pre-existing condition exclusion is upheld.

(AR000232-AR000233).

On January 11, 2005, Kansky's attorney sent a reply letter to Ms. Cody enclosing for her review and for her to incorporate as part of the administrative record in this case:

[T]he January 7, 2005, follow-up medical report of Dr. David S. Bell, the world's leading authority on Chronic Fatigue Syndrome a/k/a Chronic Fatigue Immune Dysfunction Syndrome, for [her] and [her] staff ... clarifying that Mr. Ken Kansky did not have a pre-existing condition which resulted in his having to stop work at Coca-Cola. He contracted a new illness and that is what caused him to become totally disabled from working at Coca Cola Bottling Company as of July 8, 2003.

(AR000224-AR000225).  Dr. Bell stated in this letter that:

It should be noted that Mr. Kansky did have difficulties suggesting a schizoaffective disorder, however, with medications he was able to work and, in fact, was working more than 40 hours a week. His current disability is not due to the schizoaffective disorder; it is due to chronic fatigue syndrome.  The nature of the disability in

chronic fatigue syndrome is quite different from that of
schizoaffective disorder and while he would not be
diagnosed by the current research criteria put out by the
Centers for Disease Control, his clinical diagnosis is
very clearly chronic fatigue syndrome, also known as
chronic fatigue immune dysfunction syndrome. As such, it
would be reasonable to assume that he should be eligible
for long-term disability claims as his current disability
is not caused by the schizoaffective disorder and is most
likely totally independent from that.

(AR000226).

In response, Aetna replied in a letter dated January 24,
2005 and signed again by Ms. Cody that its November 9, 2004
decision completed its contractual and regulatory obligations.
(AR000222-AR000223). However, Aetna, "as a courtesy," reviewed
Dr. Bell's letter. (AR000222). Ms. Cody concluded that Kanksy's
claim remained denied and stated in particular that the "letter
from Dr. Bell is not considered sufficient support that Mr.
Kansky did not suffer from schizoaffective disorder on January 6,
2004, or that he suffered from chronic fatigue at that time."
(AR000222).

In reply to this letter, Kansky's attorney sent a four-page
letter dated February 1, 2005 to Aetna criticizing Aetna's
decision and the qualifications of the doctors it consulted, and
promoting Dr. Bell and the Ciguatara Toxin test. (AR000218-
AR000221). Aetna declined to reverse the denial in its final
reply letter dated February 14, 2005 and signed by Mark L.
Akerman, another Aetna Senior Technical Specialist. (AR000213-
AR000214). Mr. Akerman specifically rejected the assertions in

the February 1, 2005 letter stating:

> You are asserting that the diagnosis [of CFS] is supported on the basis of the presence of the ciguatera toxin that was established many months after Mr. Kansy ceased working. The link between CFS and ciguatera is still being researched by the medical community and cannot, therefore, be relied upon as a definitive criteria of the diagnosis. Certainly it is not, by itself, evidence of a disability. In any case, the diagnosis of chronic fatigue syndrome, which is largely dependent on subjectively reported symptoms, is certainly questionable in the presence of well-documented psychiatric illness.

(AR000213).

On May 3, 2005, Kansky filed this suit against Aetna and his employer,[4] seeking judicial review of the denial of his LTD claim, sanctions against the defendants for allegedly failing to produce requested documents pursuant to 29 U.S.C. § 1132(a),(c), and an award of legal fees and expenses.[5]

## II. STANDARD OF REVIEW

Whether a de novo or deferential standard of review applies to an ERISA action depends on the degree of deference owed to the original decision-maker. This standard remains the same through all stages of federal adjudication. Leahy v. Raytheon Co., 315

---

[4] The defendants assert that "[t]here is no legal entity known as 'Coca-Cola Bottling Company of New England, Inc.' Rather, Coca-Cola Bottling Company of New England is a divsion of Coca-Cola Enterprises and, accordingly, Kansky was a Coca-Cola Enterprises employee...." Kansky does not challenge this assertion.

[5] On August 23, 2005 I dismissed Kansky's fourth count against the defendants for alleged violations of the Health Insurance Portability and Accountability Act of 1996 (HIPPA).

-14-

F.3d 11, 17 (1st Cir. 2002).  The Supreme Court determined in

Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989) that

"a denial of benefits challenged under § 1132(a)(1)(B) is to be

reviewed under a *de novo* standard unless the benefit plan gives

the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of

the plan." Id. at 115.

In this case, the defendants argue that the Plan expressly

granted such discretionary authority to Aetna.  The Group Life

and Accident and Health Insurance Policy between Aetna and Coca-

Cola Enterprises Inc. (the policy holder) provides that for the

purpose of ERISA:

> Aetna is a fiduciary[6] with complete authority to review
> all denied claims for benefits under this policy.... In
> exercising such fiduciary responsibility, Aetna shall
> have discretionary authority to determine whether and to
> what extent employees and beneficiaries are entitled to
> benefits; and construe any disputed or doubtful terms of
> this policy.  Aetna shall be deemed to have properly
> exercised such authority unless Aetna abuses its
> discretion by acting arbitrarily and capriciously.

(AR00037).  Furthermore, according to the LTD Plan brochure,

proof of disability must be provided to Aetna.  (AR000194).

---

[6] According to ERISA, "a person is a fiduciary with respect
to a plan to the extent (i) he exercises any discretionary
authority or discretionary control respecting management of such
plan or exercises any authority or control respecting management
or disposition of its assets, (ii) he renders investment advice
for a fee or other compensation, direct or indirect, with respect
to any moneys or other property of such plan, or has any
authority or responsibility to do so, or (iii) he has any
discretionary authority or discretionary responsibility in the
administration of such plan." 29 U.S.C. § 1002(21)(A).

However, the Summary of Coverage document and the LTD Plan brochure given to employees indicate that Coca-Cola Enterprises Inc., or its Welfare Benefits Committee, is actually the "Plan Administrator"[7] for purposes of ERISA. (AR000165, AR000209).  The LTD Plan employee brochure resolves this discrepancy by explaining that:

> The Welfare Benefits Committee, as Plan Administrator, has discretionary authority to construe the terms of the Plan and to interpret the meaning of any provisions which are ambiguous.  The Committee also has the authority to make final determinations on questions of [the employee's] eligibility for coverage under the Plan, for example, whether elections where properly completed or whether a family status change has occurred.
>
> However, Aetna Life Insurance Company is responsible for making the final determination with respect to the payment of benefits....
>
> The Welfare Benefits Committee may be contacted to provide assistance in an appeal of an Aetna decision. However, Aetna has the final discretionary authority to make determinations on the payment of benefits.

(AR000209, AR000211).  Consequently, I will apply the deferential arbitrary and capricious standard of review to Aetna's decision

---

[7] The term "administrator" means --

(i) the person specifically so designated by the terms of the instrument under which the plan is operated;

(ii) if an administrator is not so designated, the plan sponsor; or

(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).

to deny Kansky LTD benefits "where, as here, the language of the underlying plan reserves discretion to the insurer in determining eligibility for benefits." Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co., 230 F.3d 415, 418 (1st Cir. 2000).

Although Kansky does not challenge this determination, he argues that he is entitled to a less deferential and/or a de novo review of the determination regarding his claim since the defendant employer is "conflicted" because it must pay the first $35,000 of any LTD benefits payable under the Plan and since Aetna underwrites the remaining amount. While the Plan does provide this structure for the payment of LTD benefits, (AR00091, AR000210), the First Circuit recently reaffirmed that the fact that the decision-maker will have to pay successful claimants out of its own assets does not change the standard of review. Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 75 (1st Cir. 2005).[8]

The arbitrary and capricious standard means that a "decision

---

[8] Kansky relies on cases such as McLeod v. Hartford Life and Acc. Ins. Co., 372 F.3d 618 (3rd Cir. 2004) for the contrary proposition that "'when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review.'" Id. at 623 quoting Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 378 (3rd Cir. 2000). In Wright, however, the First Circuit decided to follow decisions of prior panels in this Circuit, even though the Court was "mindful that other circuits have rejected the market forces rationale and specifically recognized a conflict of interest when the insurer of an ERISA plan also serves as plan administrator." 402 F.3d at 75 n. 5. In making this statement, the Court specifically cited Pinto as one of the contrary decisions in other Circuits. Id.

to deny benefits to a beneficiary will be upheld if [Aetna]'s decision was reasoned and supported by substantial evidence. Evidence is substantial when it is reasonably sufficient to support a conclusion.  Evidence contrary to [Aetna]'s decision does not make the decision unreasonable, provided substantial evidence supports the decision." <u>Id.</u> at 74 (internal citations and quotations omitted).

### III.  DISPUTED EVIDENCE

To support his argument that he is entitled to LTD benefits, Kansky attached nine exhibits to his Opposition to the Defendants' Motion for Summary Judgment and in Further Support of the Plaintiff's Motion for Summary Judgment.  He also attached printouts from Aetna's InteliHealth website to his Supplementation of his Motion for Summary Judgment and in Further Opposition to Defendants' Motion for Summary Judgment.  The defendants have filed a motion to strike at least eight of the exhibits to the first Opposition[9] to rebut Kansky's effort to

_____

[9] Kansky argues that the defendants' motion to strike should be denied because it was filed in violation of Fed. R. Civ. P. 12(a) more than 20 days after November 30, 2005 when Kansky filed his own motion for summary judgment.  Rule 12(a) only speaks of serving an answer within 20 days after being served with the summons and complaint.  The relevant rule is L.R. 7.1(b)(2), which provides that "[a] party opposing a motion, shall file an opposition to the motion within fourteen (14) days after service of the motion, unless another period is fixed by rule or statute, or by order of the court."  Kansky filed his Opposition to the defendants' summary judgment motion on December 12, 2005. Although the defendants did not file their motion to strike until January 12, 2006, in light of the holiday season and the lack of demonstrable prejudice to the plaintiff, I will not deny the

supplement the Administrative Record.

The ordinary rule on supplementation of the record in this

Circuit is that:

> [R]eview for arbitrariness is on the record made before
> the entity being reviewed. True, [the First Circuit has]
> declined ... to adopt an ironclad rule against new
> evidence.  For example, discovery may be needed because
> the decisional process is too informal to provide a
> record.  And certain kinds of claims- e.g., proof of
> corruption - may in their nature or timing take a
> reviewing court to materials outside the administrative
> record.
>
> Still, at least some very good reason is needed to
> overcome the strong presumption that the record on review
> is limited to the record before the administrator.... It
> is almost inherent in the idea of reviewing agency or
> other administrative action for reasonableness; how could
> an administrator act unreasonably by ignoring information
> never presented to it?

Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st

Cir. 2003)(internal citations and footnote omitted). See also

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 519 (1st Cir.

2005).  Given these principles, I will strike Exhibits A (the

November 29, 2005 report by Dr. Vuckovic), B (Kansky's December

10, 2005 Affidavit), C (Kansky's mother's December 11, 2005

Affidavit), and D (a checklist of CFS symptoms filled out by

Kansky's mother December 12, 2005).  None of these exhibits

supplement the record before me with information considered by

---

motion to strike reframed more accurately to be based on L.R.
7.1(b)(2).

Aetna (such as, for example, reports of surveillance[10]) yet not provided to me.

I will also strike Exhibits G and H (the uncredited and unauthenticated chart titled 1994 Research Definition of CFS and the 2001 manual for clinicians and lawyers), Exhibit I (a 1990 _Newsweek_ article on CFS), and the InteliHealth website printouts. Kansky has not established their reliability and I will not take judicial notice of their reliability.  See Fed. R. Evid. 803(18). I will, however, not strike Exhibit E (SSR 99-2p, the Social Security Administration's Policy for Evaluating Cases Involving CFS), but only consider this document as background information on CFS with the understanding that this is, of course, an ERISA case.  I will also consider the 1994 Annals of Internal Medicine ("AIM") article, which according to the Centers for Disease Control and Prevention ("CDC") is the most current CFS research case definition,[11] although it is not formally part of the record.  This article is the basis for the comments of Drs. Bell, Burton, and DeFoy to the effect that Kansky cannot be diagnosed with CFS according to the current research criteria put out by

_____

[10] In Kansky's Opposition, he suggested that the Administrative Record is incomplete because it lacks documentation such as a report of the surveillance of Kansky or a formal job description.  According to the defendants, however, the Administrative Record is complete and no surveillance or formal job descriptions were considered by Aetna.

[11] See Centers for Disease Control and Prevention, _Case Definition of CFS_ (visited May 1, 2006)<http://www.cdc.gov/ ncidod/diseases/cfs/publications/case_definition.htm>.

the Centers for Disease Control.  (AR000284, AR000595, AR000648).
See Keiji Fukuda et al., *The Chronic Fatigue Syndrome: A
Comprehensive Approach to its Definition and Study*, 121 Annals of
Internal Medicine 953 (1994) ("AIM Article").[12]

## IV. DISCUSSION

### A. Count One - Claim for LTD Benefits

1. Merits

ERISA allows a participant like Kansky to bring a civil
action against insurers like Aetna "to recover benefits due to
him <u>under the terms of his plan</u>, to enforce his rights <u>under the
terms of the plan</u>, or to clarify his rights to future benefits
<u>under the terms of the plan</u>."  29 U.S.C. § 1132(a)(1)(B)(emphasis
supplied).  Here, the Plan documents specifically exclude
coverage for disabilities caused or contributed to by a pre-
existing condition. (AR000103, AR000179-AR000180, AR000195).
Consequently, Kansky does not challenge the legal proposition
that I must deny his claim for LTD Benefits if Aetna reasonably
determined that he is excluded from coverage because his
disability is caused or contributed to by a pre-existing
condition.  Rather, he challenges Aetna's factual determination
that his disability, if in fact he is disabled, is caused, or

---

[12] The article is available at <http://www.annals.org/cgi/
content/full/121/12/953>(visited May 1, 2006); <u>see</u> <u>also</u> Centers
for Disease Control and Prevention, *Complete Text of Revised Case
Definition* (visited May 1, 2006)<http://www.cdc.gov/ncidod/
diseases/cfs/about/definition/case_definition.htm>.

contributed to, by a pre-existing condition, namely

schizoaffective disorder, and not caused by the onset of a new

condition, namely CFS.

The Plan documents define pre-existing condition as follows:

An injury or illness is a pre-existing condition if, during the 3 months before the date you became covered under this Plan, you received diagnosis, treatment or services, or you took drugs prescribed or recommended by a physician, for that condition.

(AR000195; see also AR000103, AR000180).  Aetna's internal

document on pre-existing conditions indicates that this exclusion

applies where:

- The disease or injury was diagnosed or treated; or
- The claimant underwent diagnostic tests which later confirmed the presence of the disease or injury; or
- The claimant received medical services for treatment of the disease or injury; or
- The employee took drugs or medications prescribed or recommended by a physician for treatment of the disease or injury

Note: Telephonic as well as in-person services rendered by the physician during the pre-existing period constitutes "treatment"

...

If the long term plan contains a pre-existing condition limit, and the claimant's onset of disability (DCI) occurred within 12 months following the effective date of coverage, a pre-existing condition investigation should be initiated b the case manager unless it is apparent that the **functional impairment prohibiting the claimant from engaging in work** was caused by accidental injury on or about the date of disability onset.

...

Upon receipt of the claimant's medical and prescription

-22-

drug records, they should be thoroughly reviewed to determine if treatment for the **disabling condition** was rendered during the pre-existing period.

(AR000242)(emphasis supplied).

a. *Disabling Condition* - As an analytical matter, before I can decide whether Aetna reasonably determined that Kansky pre-existing schizoaffective disorder caused or contributed to his purported disability, I must determine what the disabling condition was, i.e., what functional impairment purportedly prohibited Kansky from engaging in work beginning July 8, 2003.

On the LTD claim application signed by Kansky on January 8, 2004, he indicated that the reason why he stopped working was a "chemical imbalance of physiological origin." (AR000540) He also indicated that after his disability he was "[n]ot totally but generally confined to home and required to obtain medical care and treatment as out patient at present." (AR000540). Based on a phone interview with Kansky on February 11, 2004, DawnLee Dumond of Aetna reported the following:

> EE had **sleep problems** starting as a young adult, he was on one particular medication[], has been taking prescribed meds since he was 15 years old.... **In terms of his current disability he was functioning fine until sometime in July**, due to the shift that he was on and that they kept **changing the hours** he was working, was taking an **excess of caffeine**, and that started **counteracting with his medication**.
>
> ...
>
> Basically his shift was being moved around so much, that he was working later and later in the morning, and working into the later first shift ..., **was taking no**

**doze to keep up with the work flow, and was counteracting with his medications.**

He couldn't get into any pattern of sleep, his schedule was completely off, had a cough that still hasn't gone away yet.  The doctor says this is post nasal drip - side effect of **bodily exhaustion**.

...

... if he had kept to the schedule he was supposed to be on, he would be doing OK, but because of the changing schedule, he had to supplement his energy levels.  **The combination of the hours and the caffeine messed up his medication**...

When he stopped working and went to the doctor, they took him off the caffeine, and raised his Trazadone levels and some other depression medication that he was on, and told him to sleep.

...

His symptoms since he has been out of work: **Irregular sleep habits, trouble with Sirkadium [sic] rhythm, even with meds he will sleep only about 4hrs at a time at night, sometimes he will sleep the whole day.**  He has been evaluated for sleep apnea and does not have it.

Right now: he cannot maintain a regular work schedule, he cannot work the one CCE has been imposing on him....  Once he gets his sleep regulated, he probably would be able to do a day shift.

(AR000511-AR000513, AR000764-AR000772, AR000763)(emphasis

supplied).

According to Dr. Vuckovic on July 2, 2003, prior to leaving

work, Kansky was "experiencing dysfunction in his circadian

rhythm, a condition from which he had never before suffered, and

which results in severe sleep deprivation which in turn further

results in intolerance to extreme temperature, (such as described

-24-

in the warehouse), severe and frequent headaches, excessive physical body weakness and exhaustion, reduced ability to function, reduced ability to obtain a restful and refreshing sleep, and reduced cognitive abilities." (AR000367-AR000368). According to Dr. Vuckovic in late July 2003, Kansky's diagnosis at that time was "neuropsychological disorder/physical exhaustion with secondary anxiety with stress." (AR000890; see also July 18, 2003 letter at AR000888) His subjective symptoms were "physical exhaustion, secondary anxiety, stress & debilitating reactions." (AR000890; see also July 18, 2003 letter at AR000888). With respect to Kansky's then present capabilities and limitations and physical impairment, Dr. Vuckovic indicated in a variety of articulations that Kansky is "[t]otally disabled from engaging in any gainful employment activity for the foreseeable future." (AR000889). With respect to his mental and nervous impairment, Dr. Vuckovic indicated that his stress and mental and nervous limitations are "secondary to physical exhaustion, irregular work hours, physical stress and inability to maintain regular and usual work, sleep and meal schedules." (AR000889). Finally, he indicated in the STD report that as of what appears to be July 30, 2003, (AR000889), he was treating Kansky by continuing to "[r]efine and adjust medication to hopefully allow Mr. Kansky to return to his level of functioning prior to July 7, 2003 and before" and that at present Kansky had "stabilized" although he "is required to spend rest & recovery time at home in

-25-

stress free environment." (AR000890).

After a follow-up visit on August 25, 2003, Dr. Vuckovic indicated that Kansky "requires much additional ongoing care and treatment including further adjustments to his medications, and remains symptomatic from depression and anxiety." (AR000273). After a follow-up visit on October 15, 2003, Dr. Vuckovic again indicated that Kansky "requires ongoing care and treatment including additional adjustments to his medications." (AR000275). Dr. Vuckovic also noted that Kansky "suffers from a chemical imbalance and [his] efforts are geared towards treatment by medication in an effort to restore him to his prior level of functioning." (AR000275). After a follow-up visit on December 3, 2003, Dr. Vuckovic again indicated that Kansky "requires ongoing care and treatment including additional ongoing adjustments to his medications" and that "his visits with me continue to be medical, in-office visits and not psychiatric therapy. He continues to suffer from chemical imbalance and my efforts continue to be geared toward treatment by medication in an effort to restore him to his prior level of functioning." (AR000276).

Kansky was subsequently treated as an in-patient at McLean Hospital from December 28, 2003 through January 7, 2004. According to his mother, he was admitted to McLean Hospital after going to the Beth Israel hospital "because he was sure he had a brain tumor." (AR000252; see also father's account at AR000337,

McLean Hospital's Discharge Summary at AR000247).  The Discharge
Summary from McLean Hospital indicated that he was admitted "for
an acute exacerbation of psychotic symptoms including auditory
hallucinations, paranoia and persecutory delusions that everyone
around him was connected at Beth Israel Deaconess Medical Center
as well as delusions that he had a brain tumor that needed to
come out." (AR000248) The Summary indicated compliance issues
with his medication and reported that Kansky "admitted to
difficulty with sleep where he was sleeping at 3:00 am and waking
up at 1:00 pm."  (AR000248).  After Kansky improved, he was
discharged to his parents' home with plans to continue in the
partial hospital program "for the purposes of further
psychoeducation and medication education" and for a psychopharm
follow up with Dr. Vuckovic.  (AR000249-AR000250).  The Summary
indicated "no restrictions in his level of activity."
(AR000250).

In Dr. Vuckovic's February 10, 2004 Disability Attending
Physician's Statement and Mental Health Provider's Statement, he
indicates that Kansky's subjective symptoms were depression and
paranoia.  (AR000807, AR000812).

Given these medical reports and self-reports, I find that
Kansky did not return to work on July 8, 2003 because of physical
exhaustion, chemical imbalance, anxiety and stress, and adverse
drug reactions.  He continued to be absent from work during the
26-week benefit qualifying period because of sleep problems,

chemical imbalance, anxiety and stress, depression, and paranoia.

b. *Cause of Disabling Condition* - Aetna repeatedly reaffirmed its decision that the disabling condition for which Kansky is seeking LTD benefits or the functional impairment that purportedly prohibited him from engaging in work was caused or contributed to by his pre-existing schizoaffective disorder for which he received treatment and took medication during the pre-existing condition exclusionary period, and that Dr. Bell's July 2004 opinion and Kansky's February 2004 Ciguatara Toxin Test results were insufficient to disprove this finding. (AR000238, AR000232-AR000233, AR000222-AR000223).  Kansky does not contest that he was treated by Dr. Vuckovic and took medications during the pre-existing condition period for the same condition as to which he continues to be treated and to take medications.  These facts differentiate this case from <u>Glista v. Unum Life Ins. Co. of America</u>, 378 F.3d 113 (1st Cir. 2004), where the exclusion clause issue turned on whether the claimant was treated for the sickness that caused him to become disabled during the pre-existing period.  <u>Id.</u> at 126.  Kansky, by contrast, challenges Aetna's causation conclusion that his pre-existing condition caused or contributed to his disability in July 2003.  He contends that "[h]e contracted a new illness [CFS] and that is what caused him to become totally disabled from working at Coca Cola Bottling Company as of July 8, 2003." (AR000224-AR000225).

From the correspondence between the parties, Aetna offered four discernable reasons to support its determination that Kansky's disabling condition was caused or contributed to by his pre-existing schizoaffective disorder and not by the onset of CFS alone.

First, and most simply, the pre-existing schizoaffective disorder -- aggravated by the inconsistent shift work schedule and the ingestion of caffeine -- was a factual cause, **or at least contributed to**, his functional impairment prohibiting him from working beginning at least as early as July 2, 2003. (See AR000901-AR000902 - July 2, 2003 letter from Kanksy's father to Dr. Vuckovic reporting that Kansky "has been struggling to work at what is turning out to be an 'unsuccessful work attempt'"; AR000903-AR000904 - July 2, 2003 letter from Dr. Vuckovic to Whom It May Concern reporting that Kansky is unable to continue his work safely as a result of "his increasingly poor health resulting from his current work conditions"). This premise is supported by Dr. Vuckovic's reports, McLean Hospital Discharge Summary, Kansky's LTD benefits application, Kansky's interview with DawnLee Dumond, Dr. Burton's opinion, and Dr. DeFoy's opinion. The symptoms that disabled Kansky beginning in July 2003 are consistent with the clinical criteria for schizoaffective disorder, bipolar type listed by Dr. DeFoy, (AR000594-AR000595), and with a fitful sleeping pattern and

adverse caffeine-induced drug reactions. (AR000511-AR000513, AR000764-AR000772, AR000763, AR000812, AR000888-AR000890). According to Dr. Vuckovic, Kansky's symptoms are also consistent with the side effects of the medications he was taking to treat his mental illness. (AR000813 - indicating "lethargic and sleepy" as the two side effects of Kansky's medication). In addition, Dr. Burton specifically opined that Kansky's "mental/nervous condition is [] the likely source of his stated complaints of fatigue, etc." (AR000640). And in February 2004, Dr. Vuckovic reaffirmed the ongoing role of Kansky's schizoaffective disorder by indicating that "[a]t present and for immediate future, patient must avoid stress until meds adjusted accordingly to restore patient to prior level of functionality as prior to 07/08/2003." (AR000810). The only contrary evidence is Dr. Bell's conclusory opinion that "[h]is current disability is not due to the schizoaffective disorder; it is due to chronic fatigue syndrome. The nature of the disability in chronic fatigue syndrome is quite different from that of schizoaffective disorder.... [H]is current disability is not caused by the schizoaffective disorder and is most likely totally independent from that." (AR000226). Given this record, Ms. Cody reasonably determined that Kansky's schizoaffective disorder caused or at least contributed to the symptoms disabling him after July 2003, and that Dr. Bell's conclusory opinion is not sufficient to disprove this fact. (AR000272).

Second, Dr. Bell cannot confirm a diagnosis of CFS caused by an unknown condition independent from Kansky's schizoaffective disorder. Dr. Bell states this explicitly in his initial report: "At the present time Mr. Kansky would not fulfill the Centers for Disease Control criteria for chronic fatigue syndrome as he has a history of atypical schizophrenia." (AR000284). Dr. DeFoy explained that this restriction results from the fact that the clinical criteria for schizoaffective disorder, bipolar type includes sleep disturbance and fatigue, which "preclude[s] the diagnosis of chronic fatigue syndrome being made after a diagnosis of a psychiatric disorder that includes a depressive episode." (AR000595).

CFS is "a clinically defined condition characterized by severe disabling fatigue and a combination of symptoms that prominently features self-reported impairments in concentration and short-term memory, sleep disturbances, and musculoskeletal pain." AIM article at 953. The medical community has not identified the cause or causes of CFS and there are no specific diagnostic tests. Since many illnesses have incapacitating fatigue as a symptom, "[d]iagnosis of the chronic fatigue syndrome can be made only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded." Id.[13] The current accepted "Guidelines for the

---

[13] According to the AIM Article:

Clinical Evaluation and Study of the Chronic Fatigue Syndrome and
Other Illnesses Associated with Unexplained Chronic Fatigue"
specifically excludes patients suffering from certain conditions
that explain chronic fatigue, including "[a]ny past or current
diagnosis of a major depressive disorder with psychotic or
melancholic features; bipolar affective disorders; schizophrenia
of any subtype; delusional disorders of any subtype;...", from
the "diagnosis of <u>unexplained</u> chronic fatigue." AIM article at
955.  The authors of the AIM Article explain:

> Many conditions that are primary causes of chronic
> fatigue **preclude** the diagnosis of the chronic fatigue

----

The central issue in chronic fatigue syndrome research is
whether the chronic fatigue syndrome or any subset of it
is a pathologically discrete entity, as opposed to a
debilitating but nonspecific condition shared by many
different entities. Resolution of this issue depends on
whether clinical, epidemiologic, and pathophysiologic
features convincingly distinguish the chronic fatigue
syndrome from other illnesses.

Clarification of the relation between the chronic fatigue
syndrome and the neuropsychiatric syndromes is
particularly important. The latter disorders are
potentially the most important source of confounding in
studies of chronic fatigue syndrome. Somato form
disorders, anxiety disorders, major depression, and other
symptomatically defined syndromes can manifest severe
fatigue and several somatic and psychological symptoms
and are diagnosed more frequently in populations affected
by chronic fatigue and the chronic fatigue syndrome than
in the general population.

The extent to which the features of the chronic fatigue
syndrome are generic features of chronic fatigue and
deconditioning due to physical inactivity common to a
diverse group of illnesses must also be established.

AIM article at 957 (footnotes omitted).

syndrome or idiopathic chronic fatigue. We presented principles for identifying such exclusionary conditions rather than listing them because of the range and complexity of human illnesses. In some instances, however, we identified specific exclusionary conditions. The presence of **severe obesity** makes the diagnosis of unexplained symptoms, such as fatigue or joint pains, extremely difficult. We distinguished between psychiatric conditions for pragmatic reasons. **It is difficult to interpret symptoms typical of the chronic fatigue syndrome in the setting of illnesses such as major psychotic depression or schizophrenia. More importantly, care of these persons should focus on their chronic psychiatric disorder.**

AIM article at 957 (emphasis supplied).

Despite Dr. Bell's implicit reference to the Guidelines, he maintains that "while [Kansky] would not be diagnosed by the current research criteria put out by the Centers for Disease Control, his clinical diagnosis is very clearly chronic fatigue syndrome." (AR000226). However, according to the CDC, the 1994 Guidelines were intended to be "useful both to researchers studying the illness and to clinicians diagnosing it." Centers for Disease Control and Prevention, *What is CFS?* (visited May 1, 2006)<http://www.cdc.gov/ncidod/diseases/cfs/about/what.htm>. Consequently, Ms. Cody reasonably concluded that Dr. Bell's opinion is insufficient to prove that his functional limitations beginning in July 2003 can only be attributed to CFS caused by an unknown condition independent from Kansky's schizoaffective disorder.[14]  Furthermore, Ms. Cody also reasonably dismissed the

---

[14]  I note that Aetna specifically removed from its November 9, 2004 decision the following portion of Dr. Burton's opinion:

importance of the Ciguatera Toxin test because it is not yet accepted in the scientific community as an objective indicator of CFS. (AR000213).

Third, as Dr. DeFoy opined, even if his ongoing chronic fatigue might also be caused by another medical condition independent from the depression and destabilization of his previously maintained chronic psychiatric condition, the diagnosis of schizoaffective disorder, bipolar type is still the primary diagnosis impairing Kansky. (AR000585). And, it is for his schizoaffective disorder that he continued to be treated according to Dr. Vuckovic's records and the McLean Hospital Discharge Summary. For instance, in the February 10, 2004 Mental

_____

"Most importantly, the so-called CFIDS is not a legitimate medical diagnosis. There are no diagnostic criteria that have been accepted as a basis to establish this purported diagnosis." (AR000639). If it had relied on this opinion, Aetna's decision would be dangerously close to being arbitrary and capricious under current First Circuit precedent. See Brigham v. Sun Life of Canada, 317 F.3d 72, 84 (1st Cir. 2003)("[L]aboratory tests or similar diagnostic procedures will not always be necessary to substantiate a claim of disability, as certain disabling conditions are not susceptible to such objective evaluations."); see also Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3rd Cir. 1997)("It is now widely recognized in the medical and legal communities that there is no 'dipstick' laboratory test for chronic fatigue syndrome.")); Rose v. Shala, 34 F.3d 13 (1st Cir. 1994)(Social Security case recognizing the diagnosis of CFS); Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, (7th Cir. 2003) quoting  Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996).

I also note that Aetna specifically excised from its decision Dr. Burton's opinion that "the so-called CFIDS is not a legitimate medical diagnosis. There are no diagnostic criteria that have been accepted as a basis to establish this purported diagnosis." (AR000232).

Health Provider form, Dr. Vuckovic reaffirmed the ongoing role of Kansky's schizoaffective disorder by indicating that "[a]t present and for immediate future, patient must avoid stress until meds adjusted accordingly to restore patient to prior level of functionality as prior to 07/08/2003." (AR000810). As indicated in Magistrate Judge Dein's Report and Recommendation on Cross-Motions for Summary Judgment in Houle v. Raytheon Co., Civ. No. 00-12071-NG (D.Mass. April 28, 2003), which was adopted by Judge Gertner in the Court's Order of July 18, 2003, unexplained chronic fatigue may coexist with concurrent psychiatric disorders.[15]  But even if that is so, the "[d]iagnosis of the chronic fatigue syndrome should not impede the treatment of coexisting disorders, notably depression." AIM Article at 957. Consequently, it was reasonable for Aetna to find that Kansky's preexisting schizoaffective disorder at least contributed to his

---

[15]   In Houle, the insurer's decision to terminate the claimant's benefits rested entirely on a consultant physician's opinion that the claimant was not disabled because he did "not meet the diagnostic criteria for chronic fatigue syndrome because of the presence of two conditions [sleep apnea and bipolar disorder] which are known to cause profound fatigue" and because those two conditions were controllable and did not disable him. Civ. No. 00-12071, at 20.  One of the reasons that Magistrate Judge Dein found that the insurer's decision was arbitrary and capricious is that the references upon which the consultant doctor relied stand for the contrary position that unexplained chronic fatigue may coexist with controllable mental illness. Id. at 36-38.  Here, that is essentially what Dr. DeFoy suggested: "In addition he also developed some signs and symptoms common to both chronic fatigue and major depressive disorder and may have both a condition characterized by chronic fatigue from his psychiatric disorder as well as another medical condition." (AR000585).

functional impairment during the relevant period, even if the ongoing exhaustion, pain, and fatigue Kansky reported to Dr. Bell in July 2004 might also be caused by another unexplained yet independent condition.

Fourth, Ms. Cody stated in one of the denial letters that "[e]ven if Dr. Bell found conclusively that Mr. Kansky suffered from CFIDS or any other diagnosis ..., Mr. Kanksy's condition and functionality [as of July 2003 and through the disability qualifying period] cannot [] be predicated" on Dr. Bell's July 20, 2004 examination, which took place over six months after the benefit qualifying period ended and a year after Kansky stopped working.  (AR000232).  There is, of course, no rule that prevents a claimant from supporting his or her disability theory by presenting medical evidence from either before or after the relevant period.  However, it was reasonable for Aetna to conclude that Dr. Bell's examination of Kansky a year after his present disability began could not form an adequate basis for rejecting the contemporaneous medical evidence.  That evidence supports Aetna's conclusion that the functional impairment prohibiting him from working in July 2003 through the end of the benefit qualifying period was triggered by a destabilization of his previously managed chronic schizoaffective disorder, which began at least by July 2, 2003, due to his irregular shift work, fitful sleeping pattern, adverse caffeine-induced drug reactions,

-36-

and later noncompliance with his medications.  Furthermore, the symptoms Kansky reported to Dr. Bell in July 2004 can be interpreted as consistent with Dr. DeFoy's description of the deterioration of Kansky's condition, which included the development of "some signs and symptoms common to both chronic fatigue and major depressive disorder." (AR000595, AR000585-AR000586).

In sum, I find that Aetna's decision to deny Kansky LTD benefits based on the pre-existing condition exception was reasoned and supported by substantial evidence and therefore I grant summary judgment to the defendants on this count.  On this record, it was entirely reasonable for Aetna to find that Kansky's pre-existing schizoaffective disorder caused, or a least contributed to, his disability during the relevant period, even if another independent condition might have also contributed to his fatigue and sleep problems.

1. Other Issues

a. *Credentials of Medical Experts* - Kansky suggests that Aetna's decision should be overturned because Dr. Bell is likely the world's leading clinician on chronic fatigue syndrome, whereas the Aetna reviewers and the non-interviewing, non-examining physician and psychiatric consultants contracted by Aetna did not have any expertise in chronic fatigue syndrome. While education and experience of the medical experts consulted

may be considered in determining the reasonableness of an insurer's decision, here, Kansky's claim turned on whether his pre-existing condition caused or contributed to his disability beginning in early July 2003.  The question was not simply whether Kansky suffers from CFS to a disabling degree. Consequently, I find that Drs. Burton and DeFoy were certainly qualified to provide their medical opinions on whether Kansky's pre-existing schizoaffective disorder caused or contributed to his disability in July 2003.  In any event, "[i]t is the responsibility of the Administrator to weigh conflicting evidence," including conflicting medical opinions.  Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 32 (1st Cir. 2001).

b. *Exclusion of Medical Evidence* - In Part III of the plaintiff's Memorandum in Support of his Motion for Summary Judgment, Kansky contends that unspecified medical evidence obtained by Aetna outside the scope of his signed authorizations, and thus in violation of his unspecified "privacy rights and HIPPA rights," should be stricken and/or all arguments based in whole or in part on the unlawfully obtained information should be dismissed "as being in the nature of 'the fruit of the poisonous tree.'" Apparently, the source of this grievance is Dr. DeFoy's telephone conversation with Dr. Vuckovic on April 12, 2004 when Kansky had only given authorization for written communication

with his doctor.  (AR000502).  I decline to grant this request.
In any event, I agree with the defendants that even if this
grievance has validity, it does not affect my arbitrary and
capricious review.

c.  *Wrongful withdrawal* - Kansky argues that the defendants
paid him for his first month of LRD disability by directly
depositing a check into his checking account with the remainder
into his 401K fund.  Apparently after realizing their error, the
amount was withdrawn from his checking account and his 401K fund.
I have not been pointed to any evidence of this deposit and
withdrawal in the record.[16]  In any event, as with the HIPPA
argument, even if this grievance has validity, it does not affect
my arbitrary and capricious review of Aetna's decision.  Indeed,
if Aetna had not immediately clarified that any money deposited
by Coca-Cola Enterprises did not represent Aetna's acceptance of
his claim, one could imagine an estoppel or a waiver argument
being mounted by Kansky.

**B. Count Two - Production of Documents**

In Count Two, Kansky seeks sanctions against the defendants

---

[16] Kansky only points to a letter from Aetna to himself
mentioning that "[a]ny monies directly deposited into your
account by Coco-Cola Enterprises during any time period ... must
not be misunderstood to be an acceptance of liability by Aetna
for your Long Term Disability claim.  Please contact Coca-Cola
Enterprises directly to obtain clarification of their account
with regard to the pay period" of January 2004.  (AR000509-
AR000510).

for allegedly failing to produce documents requested on May 3, 2004 pursuant to 29 U.S.C. § 1132(a),(c).[17]  At the hearing, Counsel conceded that his client was not prejudiced by any delay in the production of documents and that he did make reference to this count in his motion papers because it is a moot issue.[18] Consequently, I grant summary judgment to the defendants on this count.

## C. Count Three - Legal Fees

In Count Three, Kansky seeks legal fees, expenses and costs pursuant to 29 U.S.C. § 1132(g).  Since I have granted summary judgment to the defendants on Counts One and Two, I also grant

---

[17] Kansky also complains that the Administrative Record is incomplete because the even pages of the LTD Plan Brochure are missing.  (AR000078-AR000089).  However, the even pages are included later in the Administrative Record.  (AR000191-AR000212).

[18] Kansky's May 3, 2004 request for forty different kinds of materials was addressed to Dawn Lee Dumond at Aetna Life Insurance Company in Lexington, KY.  (AR000960-AR000965) The Summary of Coverage document and the LTD Plan brochure given to employees establish that Coca-Cola Enterprises Inc., or its Welfare Benefits Committee, is the "Plan Administrator" for purposes of ERISA, not Aetna.  (AR000165, AR000209) See 29 U.S.C. § 1002(16)(A)(i) (The administrator is "the person specifically so designated by the terms of the instrument under which the plan is operated.").  And it is only the administrator that may be held liable for failing to mail requested material pursuant to 29 U.S.C. § 1132(c) when that material has been requested. Consequently, Aetna informed Kansky in a letter dated June 17, 2004 replying to the document request that "Coca Cola Enterprises (CCE), and not Aetna Life Insurance Company (Aetna), is the Plan Administrator fo the CCE ERISA Plan" and it is "the Plan Administrator [who] is obligated to provide Plan documents upon request."  (AR000114).  There is no evidence in the record that a request was later made to Coca-Cola Enterprises.  In any event, Aetna forwarded the claim file and the Plan documents to Kansky in June 2004.  (AR000458-AR000460).

summary judgment to them on Count Three.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the defendants' Motion to Strike Exhibits A-D and G-I, I GRANT the defendants' Motion for Summary Judgment on all counts, and I DENY the plaintiff's Motion for Summary Judgment on all counts.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE